UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
‾‾‾‾‾

| | | |
|---|---|---|
| CLARENCE WATSON HERNDON, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-181 |
| | ) | |
| v. | ) | Honorable Gordon J. Quist |
| | ) | |
| WILLIE O. SMITH, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Because Petitioner filed his habeas application after the enactment of the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).

Petitioner is serving a term of life without parole, imposed by the Washtenaw County Circuit Court on August 3, 1994, after a jury convicted Petitioner of first-degree murder, MICH. COMP. LAWS § 750.321. In his *pro se* petition, Petitioner raises sixteen grounds for relief, as follows:

I.  MICHIGAN'S FELONY MURDER STATUTE IS UNCONSTITUTIONAL.

II.  MICHIGAN'S FELONY MURDER STATUTE VIOLATES EQUAL PROTECTION.

III.  THE MULTIPLICITOUS COUNTS OF MURDER DENIED PETITIONER DUE PROCESS OF LAW.

IV.  THE DELAY BETWEEN THE HOMICIDE AND PETITIONER'S ARREST DENIED PETITIONER DUE PROCESS OF LAW.

V.   PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE BY THE EXCLUSION OF POTENTIALLY EXCULPATORY EVIDENCE.

VI.   WHERE PETITIONER WAS NOT ALLOWED TO QUESTION THE INVESTIGATORS REGARDING OTHER SUSPECTS, HIS MOTION TO INTRODUCE A LETTER FROM AN INMATE TO AN INSPECTOR REGARDING THE ADMISSION OF ANOTHER INMATE, AND HIS MOTION TO REOPEN THE PROOFS WAS DENIED, PETITIONER WAS DENIED HIS RIGHT TO PRESENT A DEFENSE.

VII.   PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY THE UNLAWFUL ADMISSION OF DNA EVIDENCE.

VIII.   PETITIONER WAS DENIED A FAIR TRIAL BY THE ADMISSION OF A STATEMENT MADE AT A PRIOR PROCEEDING, AND BY THE DENIAL OF PETITIONER'S REQUEST TO ADMIT THE ENTIRE VIDEO UNDER THE RULE OF COMPLETENESS.

IX.   PETITIONER WAS DENIED HIS FIFTH AMENDMENT RIGHT AGAINST COMPELLED SELF-INCRIMINATION BY THE INTRODUCTION OF UN-MIRANDIZED STATEMENTS GIVEN UNDER COERCION TO DEPARTMENT OF CORRECTIONS EMPLOYEES.

X.   PETITIONER WAS DENIED DUE PROCESS OF LAW BY THE LATE ENDORSEMENT OF CORRECTIONS OFFICER BENTLY AND HIS FALSE TESTIMONY.

XI.   PETITIONER WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT DENIED A MOTION TO EXCLUDE ILLEGALLY SEIZED EVIDENCE.

XII.   PETITIONER WAS DENIED A FAIR TRIAL BY THE INTRODUCTION OF ENLARGED, HIGHLY INFLAMMATORY PHOTOGRAPHS WHICH WERE MORE PREJUDICIAL THAN PROBATIVE.

XIII.   PETITIONER WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT DENIED A MOTION TO EXCLUDE EVIDENCE THAT MR. HERNDON'S UNEMPLOYMENT WAS TERMINATED T[]WO YEARS PREVIOUSLY WHERE THIS EVIDENCE WAS TOO REMOTE IN TIM[]E AND LACKING IN PROBATIVE VALUE TO BE RELEVANT TO SHOW MOTIVE FOR THE MURDER.

XIV.   PETITIONER WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE TRIAL COURT DENIED HIS MOTION FOR A JURY VIEW.

XV.    THE EVIDENCE OF MURDER OF A CORRECTIONS OFFICER WAS INSUFFICIENT AND PETITIONER'S CONVICTION VIOLATES DUE PROCESS.

XVI.   PETITIONER WAS DENIED A FAIR TRIAL BY THE ERRONEOUS INSTRUCTION THAT A NON-EXCULPATORY FALSE STATEMENT BY PETITIONER COULD BE USED AS SUBSTANTIVE EVIDENCE OF GUILT, AN INSTRUCTION WHICH UNFAIRLY EMPHASIZED THE THEORY OF THE PROSECUTION.

Respondent has filed an answer to the petition (docket # 18) stating that the grounds should be denied because they are either noncognizable state law claims and/or have no merit.  Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the February 5, 1996, murder of a Michigan Department of Corrections (MDOC) officer at the Huron Valley Men's Facility (HVMF).  Petitioner was arraigned on a two-count complaint alleging first-degree felony murder for the murder of a corrections officer,  MICH. COMP. LAWS 750.316(1)(c), and open murder of a corrections officer, MICH. COMP. LAWS 750.316.  Following a preliminary examination held June 26, 1997, the title of the first count was amended to first-degree murder of a corrections officer, pursuant to MICH. COMP. LAWS 750.316.  (Prelim. Tr., 136-37, docket # 28.)  Petitioner was tried before a jury beginning September 21, 1998, and concluding on October 5, 1998.

The following facts are taken from the June 15, 2001 published opinion of the Michigan Court of Appeals[1]:

Tammy Sperle worked in the prison store at the Huron Valley Men's Facility (HVMF) in Washtenaw County. Herndon worked at the prison store for about four weeks in the summer of 1994; at least part of that time was with Sperle. Though Sperle evidently had no complaints about Herndon's conduct, she asked prison officials to reassign him to another position elsewhere in the prison when an injury Herndon sustained prevented him from being able to lift heavy items, as the job required. When removed from his position at the prison store, Herndon filed a grievance. He also tried to be reinstated at the prison store several times, with the latest attempt on December 13, 1995.

Sperle went to work at the prison store on February 5, 1996. She met with Herndon and other inmates who served on the prison store committee, which met between 8:00 a.m. and 10:00 a.m. The store committee generally made recommendations to the storekeeper, Sperle, regarding what items to stock and the price at which to sell items. At this meeting, the committee members were given samples of soup to determine if the prison store should sell it.

At approximately 11:30 a.m., prison employee John Jeffries spoke with Sperle on the telephone, but when he walked past the prison store at 11:45 a.m., he noticed that it was closed. When Perry Taylor, an HVMF employee who worked in the prison warehouse, went to the store between 1:15 p.m. and 1:30 p.m. to deliver supplies, he discovered Sperle's body on the floor. Sperle was lying on her back, her arms were extended, and she was surrounded by blood. Taylor used his key to enter the storeroom from a hall, but saw that another door that led to the front entrance to the prison yard was open. When he saw Sperle's body, Taylor immediately notified the corrections officer sitting outside the door that Sperle needed medical attention.

Harvey Dutcher, a hearing investigator at the prison, responded to the calls for help. He observed that Sperle looked as if she had been beaten badly, her face was bloody, and some of her teeth had been knocked loose. Dutcher checked for Sperle's pulse and when he did not feel one, he started cardiopulmonary resuscitation (CPR), but failed to revive Sperle. When Lola Garland, a resident nurse manager at the prison, arrived at the scene she performed mouth-to-mouth resuscitation while Dutcher performed chest compressions. She observed that Sperle's chest did not rise

---

[1]Petitioner has not set forth an alternative summary of the facts. I have reviewed the trial transcript in its entirety and find the recitation of the Michigan Court of Appeals constitutes a sufficient summary of Petitioner's claims for purposes of this report and recommendation. Any additional necessary facts will be set forth separately in discussion of the specific claims under review.

as expected when she blew air into Sperle's mouth. Garland believed that the victim was already dead because Sperle's skin was pale and cold. Dutcher and Garland both noticed a cup of instant soup lying on the floor a few inches from Sperle's body.

James Whiteman, a nurse at the prison, joined Dutcher and Garland in less than a minute after he received the distress call. Dutcher and Garland were already performing CPR on Sperle, but air was not entering Sperle's lungs. Whiteman, who observed that Sperle's facial bones were broken, tried to open Sperle's airway, but noticed that a cord was bound around her neck so tightly that it was imbedded in her skin and not visible to a casual observer. Whiteman then cut the cord off Sperle's neck and again began to perform CPR. He or another medical professional who responded to the call for help administered medication to Sperle to stimulate her heart, but Sperle never regained a pulse. Because Sperle's neck had become so swollen from the cord wrapped around her neck, Whiteman and an emergency medical technician performed a tracheotomy on Sperle in the hope that they would be able to get air into her lungs. The emergency medical professionals continued to attempt to revive Sperle as they transported her to the hospital, but never succeeded. Sperle was pronounced dead at the hospital.

Prison officials sounded an alarm at 1:45 p.m. According to Sergeant Lee Boardman and Ronald Koch, resident unit officers (RUO) in Herndon's housing unit at HVMF, the alarm required prison employees to lock all doors and secure the inmates in their cells so the employees could account for all the inmates. Neither man knew why the alarm had sounded, but they were instructed to do a room-to-room search to determine if any inmates had abrasions, marks, or cuts on their hands. Boardman and Koch both observed that Herndon had cuts and bruises around his fingers or knuckles; he was the only inmate with wounds that looked fresh.

After checking the other inmates, RUO Koch and resident unit manager (RUM) Dennis Hammond returned to Herndon's cell to ask him how he injured his hands. When Herndon gave conflicting stories, they placed him in handcuffs and took him to a segregation area, where Herndon was strip-searched and his shoes were confiscated. Prison officials subsequently searched Herndon's cell and seized a blue jacket with dark stains, a pair of green pants, and a pair of damp gloves. Their investigation into Herndon's whereabouts before, during, and after the murder revealed that, following the prison store committee meeting, HVMF staff checked Herndon into his cell at 10:35 a.m. Herndon was released for lunch at approximately 11:55 a.m. and did not return until 12:50 p.m., even though he was only supposed to be gone thirty-five to forty minutes. At 1:00 p.m. Herndon was released unescorted with other inmates to go to the field house or to the yard.

Ervin Brown, an inmate who worked in the prison laundry in February 1996, was able to account for some of Herndon's time on the day of the murder. Brown said that Herndon brought him soup at approximately 10:00 a.m. Herndon then approached Brown in the laundry room at about 1:00 or 1:15 p.m. Brown thought that Herndon looked nervous or tense and had some blood on his face, which Brown removed with a soapy towel. Herndon reportedly asked Brown to wash his jacket and a pair of gloves, which Brown saw had blood on them. Brown asked Herndon if something was wrong and Herndon purportedly replied, "[D]on't worry about it. The less you know the better." Herndon then left the laundry, but returned approximately forty minutes later to retrieve the laundered jacket and gloves. At that time he gave Brown a pair of pants and a shirt to be washed immediately. Brown saw what appeared to be blood spots on the pants and told Herndon that he wanted to know what was going on and Herndon replied that "in a few minutes they were going to find a body." Brown said that he put the shirt and bloody pants in the blood pathogen hamper because the police did not "go into" that hamper, but before he could wash the clothes, the emergency siren sounded and he had to return to his cell for the inmate count. The prison was locked down for the next four or five days, during which time Brown learned of Sperle's murder. He then contacted RUM Hammond to reveal what he knew. Brown showed RUM Hammond Herndon's bloody pants, which were still in the hamper. DNA analysis conducted as part of the investigation into this crime revealed that Herndon's pants, jacket, and shoes had blood on them that matched Sperle's blood. Fingerprint analysis revealed that one of Herndon's fingerprints was on the soup container that was lying on the floor next to Sperle's body.

Herndon, who testified at trial, disclaimed any part in the murder and denied that the shoes and clothing introduced into evidence belonged to him. He explained that following the prison store committee meeting he gave inmates Brown and Johnson soup samples. According to Herndon, he injured his knuckles when he passed the soup sample through the food slot in Johnson's cell. He also said that he did not go to the dining room on the day of the murder. Instead, he went to the day room and had his soup sample for lunch. He was locked up from 12:45 p.m. until 1:00 p.m., when he went to the utility room to play chess. When he heard the alarm, he returned to his cell. Because his theory was that another inmate killed Sperle, Herndon called several other inmates to testify regarding who they believed had a reason or opportunity to commit the murder. For instance, one inmate stated that he saw inmate and prison store worker James Friar, who looked nervous, sitting on a bench near the prison store at around the time of the murder. Also, two weeks before the murder, inmate Steven Foster, another prison store worker, reportedly threatened to kill Sperle and, on the day of the murder, he cut himself shaving and used a towel to wipe away the blood. Despite this evidence on behalf of the defense, the jury convicted Herndon of Sperle's murder.

*People v. Herndon*, 633 N.W.2d 376, 385-87 (Mich. App. 2001).

At the conclusion of trial, on October 5, 1998, the jury found Petitioner guilty of first-degree murder on two grounds, premeditated murder and murder of a corrections officer.  (Tr. X, 3; docket # 37.)[2]  On November 12, 1998, Petitioner was sentenced to serve a term of life imprisonment without parole.  (Sentencing Transcript, ("S. Tr."), 8, docket # 38.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on September 21, 1999, raised thirteen issues, all of which are raised in this application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket # 39.)  Petitioner filed a pro per supplemental brief raising an additional four issues on November 19, 1999.  (Def.-Appellant's Pro Per Br., docket # 39.)  On July 17, 2000, Petitioner sought leave to file an additional supplemental brief adding one additional issue, but the motion was denied on August 9, 2000. (8/9/00 Mich. Ct. App. Order ("MCOA Ord."), docket # 39.)  By published opinion issued on June 15, 2001, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.[3]  (See *People v. Herndon*, 633 N.W.2d 376 (Mich. Ct. App. 2001); 6/15/2001 Mich. Ct. App. Opinion ("MCOA Op."), docket # 39.)

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same eighteen claims raised before and rejected by the Michigan Court of Appeals.  By order entered March 29, 2002, the Michigan Supreme Court denied

---

[2]Trial transcripts for ten days of jury trial from September 21-25, 1998, September 28-29, 1998, October 1-2, 1998, and October 5, 1998 are numbered sequentially "Tr. I" through "Tr. X."

[3]The court of appeals, however, remanded for administrative correction of clerical errors in the judgment of conviction.

his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See Mich. Ord., docket # 40.)  Petitioner filed his petition in this Court on March 12, 2003.

<u>Discussion</u>

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state

courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## I.      Constitutionality of Felony Murder Statute:  Grounds 1 and 2

In his first two grounds for relief, Petitioner contends that the Michigan felony murder statute is unconstitutional.  First, Petitioner contends that the statute violates the Due Process Clause of the Fifth and Fourteenth Amendments because it imposes punishment based on strict liability.  Second, Petitioner asserts that the statute violates the Equal Protection Clause of the Fourteenth Amendment.

### A.      Due Process

Michigan law defines first-degree murder as follows:

(1) A person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life:

(a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

(b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, or kidnapping.

(c) A murder of a peace officer or a corrections officer committed while the peace officer or corrections officer is lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer, knowing that the peace officer or corrections officer is a peace officer or corrections officer engaged in the performance of his or her duty as a peace officer or corrections officer.

MICH. COMP. LAWS § 750.316.  Petitioner contends that the Michigan "felony-murder" statute unconstitutionally allows conviction for first-degree murder without proof of any sort of intent.  He relies on *Morissette v. United States*, 342 U.S. 246, 250-51 (1952), and *United States v. United*

*States Gypsum Co.*, 438 U.S. 422, 436-38 (1978), for the proposition that strict liability offenses generally violate due process, except in very limited circumstances such as public welfare or regulatory offenses involving small penalties. *See United States Gypsum*, 438 U.S. at 437. *See also United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513 (1994); *Staples v. United States*, 511 U.S. 600 (1994).

The Michigan Court of Appeals extensively reviewed Petitioner's claim, applying *Morissette*. The court rejected Petitioner's assertion that the statute penalizing murder of a corrections official as first-degree murder constituted a strict liability offense.[4] Instead, the court found that the statute unquestionably included a *mens rea* requirement:

> MCL 750.316(1)(c) consists of four elements. First, that the defendant committed a murder. Second, that the victim was a "peace officer or corrections officer." Third, that the victim was "lawfully engaged in the performance of any of his or her duties as a peace officer or corrections officer." Fourth, that the defendant knew the victim was a peace officer or corrections officer performing lawful duties at the time of the murder.

> The first element under M.C.L. § 750.316(1)(c) incorporates the proof necessary to sustain a conviction for murder. The crime of murder is defined by statute in Michigan and may be first-degree deliberate and premeditated murder, second-degree murder, or felony-murder. All three of these forms of murder require proof of some form of criminal intent. First-degree murder is a specific intent crime, which requires proof that the defendant had an intent to kill. Second-degree murder

---

[4]Petitioner argues that the statute in issue is the felony-murder statute, MICH. COMP. LAWS § 750.316(1)(b), rather than the statute penalizing murder of a peace or corrections officer, MICH. COMP. LAWS § 750.316(1)(c). As the court of appeals noted, Petitioner was not tried or convicted under the felony-murder statute, MICH. COMP. LAWS § 750.316(1)(b):

> Evidently, the erroneous reference to felony-murder . . . arose because the original criminal information listed felony-murder in count I. At the preliminary examination, the district court magistrate granted the prosecutor's motion, to which Herndon did not object, to correct the error in the information by substituting murder of a corrections officer for felony-murder. There is no question that Herndon was tried and convicted on theories of premeditated and deliberate murder as well as murder of a corrections officer . . . .

*Herndon*, 633 N.W.2d at 393.

is a general intent crime, which mandates proof that the killing was "done with an intent to kill, an intent to inflict great bodily harm, or an intent to create a very high risk of death with the knowledge that the act probably will cause death or great bodily harm." Felony-murder is also a general intent crime, requiring evidence of one of the three intents necessary to prove second-degree murder.

We conclude that M.C.L. § 750.316(1)(c) cannot and does not create a strict liability crime because, to be convicted of murder under its provisions, the prosecutor must prove beyond a reasonable doubt all the elements of one of these three forms of murder, each of which requires proof of a specific or general intent. The trial court in this case related this very information to the jury in its closing instructions, informing the jury that it had to find that Herndon "had one of these three states of mind: he intended to kill, or he intended to do great bodily harm to Tammy Sperle, or he knowingly caused a very high risk of death or great bodily harm knowing that death or such harm was the likely result of his actions."

Herndon's related argument that M.C.L. § 750.316(1)(c) is essentially unconstitutional because a person who "only" committed second-degree murder could have his conviction elevated to first-degree solely on the basis of the victim's status, a strict liability element, is also unpersuasive. Michigan law is not offended when a statute has a single strict liability element. More importantly, the aggravating circumstances under the statute do not consist solely of the victim's status as Herndon contends. Rather, it is the victim's status and conduct, *plus* the defendant's knowledge of that status, *plus* the fact that the defendant knew that the officer was lawfully performing the officer's duties at the time of the killing that elevate the crime from second-degree murder to first-degree murder. Further, case law suggests that proof of the defendant's knowledge creates a general intent requirement in the fourth element of this crime. Thus, even the element that makes killing a peace or corrections officer first-degree murder is not a strict liability element.

*Herndon*, 633 N.W.2d at 389-90 (footnotes omitted).

The Michigan Court of Appeals decision unquestionably applies the standards set forth by the United States Supreme Court in *Morissette*, and its determination clearly constitutes a reasonable application of that law. Accordingly, Petitioner's first ground for habeas relief should be denied.

### B.    Equal Protection

In his second ground for habeas relief, Petitioner asserts that MICH. COMP. LAWS § 750.316(1)(c) violates equal protection because it imposes a harsher penalty for what otherwise would be punishable only as second-degree murder, solely because of the occupation of the victim. The Michigan Court of Appeals rejected Petitioner's claim, reiterating the holding of another panel's then-recent decision rejecting the proposition. *See Herndon*, 633 N.W.2d at 391 (quoting *People v. Clark*, 622 N.W.2d 344, 346 (Mich. Ct. App. 2001)).

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. CONST., amend. XIV; *Phyler v. Doe*, 457 U.S. 202, 216 (1982); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Phyler*, 457 U.S. at 216-17; *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). Because neither a fundamental right nor a suspect class is implicated in this case, Petitioner is not entitled to strict or intermediate scrutiny of the statute. As a result, the statutory distinction imposing an increased penalty for murder when the victim is an on-duty peace or corrections officer need only be rationally related to a legitimate governmental interest. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discrimination and require only that the classification challenged be rationally related

- 13 -

to a legitimate state interest."); *United States v. Kras*, 409 U.S. 434, 446 (1973); *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997).

The Supreme Court never has held that the imposition of an increased penalty for murder of a peace or corrections officer violates equal protection. Indeed, in concluding that such circumstance could not be used to mandatorily impose the death penalty, the Court expressly recognized that the fact that the victim was such an "officer performing his regular duties may be regarded as an aggravating circumstance" in the imposition of a penalty. *Roberts v. Louisiana*, 431 U.S. 633, 636 (1977). The Michigan Court of Appeals, relying on *Roberts*, held that the state unquestionably had a legitimate governmental interest in "'affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property.'" *Clark*, 622 N.W.2d at 346 (quoting *Roberts*, 431 U.S. at 636). The *Clark* court concluded that [c]lassifying the murder of a peace or corrections officer as first-degree murder provides a deterrent to killing individuals who regularly risk their lives in the performance of their duties as law enforcement officers." *Clark*, 622 N.W.2d at 346. As a consequence the court concluded that "the statute is rationally related to the legitimate governmental interest of protecting peace and corrections officers in the performance of their duties." *Id.* In applying the *Clark* decision to the instant case, the Michigan Court of Appeals observed that "[w]hen peace and corrections officers are killed, the crime is not only heinous because of the victim's death, it is particularly serious because it tends to destabilize society by removing those who act as our protectors." *Herndon*, 633 N.W.2d at 391. As a consequence the court held that MICH. COMP. LAWS § 750.316(1)(c) was rationally related to a legitimate governmental purpose and therefore does not violate the Equal Protection Clause.

The determination by the Michigan Court of Appeals that the statute did not violate the Equal Protection Clause unquestionably constituted a reasonable application of Supreme Court precedent.  The state rationally could conclude that the need to protect law enforcement officers warrants the imposition of heightened punishment for the intentional murder of a peace or corrections officer. As a result, I recommend that Petitioner's second ground for habeas relief be denied.

## II.        Due Process – Multiple Theories of First-degree Murder:  Ground 3

Petitioner next asserts that his right to due process was violated when the prosecutor charged him with two counts of murder, one for first-degree premeditated murder and one for first-degree murder of a corrections officer.  Petitioner does not argue that the prosecutor was prohibited from pursuing a first-degree murder conviction on alternate theories.  Instead, he contends that the charging of two separate counts for a single killing was improper.

The United States Supreme Court has held that a defendant's right to due process is not violated when a state prosecutor advances two theories of first-degree murder.  *See Schad v. Arizona*, 501 U.S. 624 (1991).  Indeed, in *Schad*, the Court concluded that due process is not violated by a single general verdict of guilt on a count of first-degree murder that did not require the jury to agree upon a single theory.  *Id.* at 632.

In the instant case, the Michigan Court of Appeals concluded that Petitioner was not entitled to a new trial or re-sentencing on the basis of the prosecutor's decision to charge the offense in two separate counts.  The court acknowledged that, under Michigan law, the two charges technically should not have been filed as separate counts, but instead listed as alternate theories under a single count.  However, the court found no error of constitutional significance.  As the court

- 15 -

noted, the jury was asked to decide and did decide only a single count of murder, finding guilt on two theories under that count.  *Id.*  The proofs at trial addressed the killing of a single person.  As a result, contrary to Petitioner's suggestion, the jury could not have been influenced by the suggestion that Petitioner committed several crimes, and the findings of guilt on alternate theories therefore did not result in confusion about Petitioner's guilt of first-degree murder.  Further, the Michigan Court of Appeals noted that the judgment of sentence mistakenly reflected conviction on two counts.  The court therefore ordered the case remanded for correction of the judgment of sentence.  *Herndon*, 633 N.W.2d at 392-93.

The determination by the Court of Appeals was patently reasonable.  Under *Schad*, charging and prosecuting a defendant on multiple theories of guilt for a single offense is squarely constitutional.  *Id* at 632.  Moreover, no United States Supreme Court decision bars charging under multiple counts for the same offense conduct, even if a defendant could not simultaneously be convicted and sentenced on all of those counts.  *See United States v. Gaddis*, 424 U.S. 544, 550 (1976).  Further, where two convictions have been entered, ordinarily the correction of the judgment of sentence is sufficient to correct the error.  *See Gaddis*, 424 U.S. at 549.  Here, the court of appeals properly remanded the case to the trial court to correct the judgment of conviction so that it reflected only one conviction based on two statutory grounds,  MICH. COMP. LAWS §§ 750.316(1)(a) and (c).

In sum, the determination by the Michigan Court of Appeals constituted a reasonable application of Supreme Court precedent.  I therefore recommend that Petitioner's third ground for habeas relief be denied.

### III.    Pre-Arrest Delay :  Ground 4

In his fourth ground for habeas relief, Petitioner asserts that he was denied due process by the length of delay between the murder, February 5, 1996, and the date he was charged and arrested, June 12, 1997.  The Supreme Court has recognized that "the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that . . . pre-indictment delay . . . caused substantial prejudice to [a defendant's right to] a fair trial and that the delay was an intentional device to gain tactical advantage over the accused."  *United States v. Marion*, 404 U.S. 307, 324 (1971); *United States v. Lash*, 937 F.2d 1077, 1088 (6th Cir. 1991).  The Court noted, however, that not every delay-caused detriment requires dismissal of the indictment.  *Id.*  Subsequently, in *United States v. Lovasco*, 431 U.S. 783, 796-97 (1997), the Court explained that whether pre-accusation delay requires dismissing a prosecution depends on both the nature of the prejudice and the reasons for the delay and is properly left to a determination based on the circumstances of a particular case.  *Id.*

Petitioner contends that the delay in the instant case was prejudicial because of the following circumstances:

> [H]e was "illegally" detained in segregation, was denied access to personal and legal property, was denied use of a telephone and visitation, and eventually was unable to recall the events that occurred on the day of the murder and the names of prisoners who could have assisted in his defense.

*Herndon*, 633 N.W.2d at 391.  The prosecutor represented that the delay occurred because the police continued to investigate the crime by conducting witness interviews and performing DNA tests, which were not complete until April 28, 1997.

Both the trial court and the Michigan Court of Appeals applied *Lovasco*'s two-part standard for determining whether a pre-arrest delay violates due process. *Herndon*, 633 N.W.2d at 391. The courts concluded that Petitioner had failed to demonstrate either prong of the test:

> Herndon has not carried his burden of showing actual and substantial prejudice because his claims were merely speculative and unsupported. Moreover, as the trial court noted, Herndon knew that he was a suspect and, therefore, had "every reason to remember who his potential witnesses" were. Even if he did suffer actual prejudice, the reason for the delay – the exhaustive investigation – was proper in this case. Thus, we conclude that the trial court did not abuse its discretion in denying the motion to dismiss.

*Herndon*, 633 N.W.2d at 392 (footnotes omitted).

The determinations of the state courts are entitled to deference by this court unless they are legally and/or factually unreasonable. 28 U.S.C. § 2254(d)(1) and (2). The court of appeals' findings clearly are reasonable applications of Supreme Court precedent. Petitioner understood that he was a suspect from the beginning of the investigation. While he appears to assert that the state had conducted the bulk of its investigation early, he does not challenge the factual accuracy about the DNA screenings. As the Supreme Court has noted on more than one occasion:

> "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction."

*Marion*, 404 U.S. at 307 n.18 (quoting *Hoffa v. United States*, 385 U.S. 293, 310 (1966)). Because the state court determinations are patently reasonable, I recommend denial of Petitioner's fourth ground for habeas review.

- 18 -

### IV.     Right to Present a Defense:  Grounds 5 and 6

Petitioner contends that he was denied his Sixth and Fourteenth Amendment rights to present a defense by the exclusion of certain evidence.  In ground five of his petition, he asserts that the court erred in refusing to appoint for Petitioner a medical expert to review, analyze and potentially testify that Sperle's death was caused by the intervening medical treatment she was given.  He also argues that the court improperly rejected two nurse witnesses from the defense list whom he claims would have supported his defense that resuscitation procedures caused the death of the victim.  In ground six, Petitioner argues that the trial court erred in refusing to admit a letter sent by another inmate to an inspector, implicating a different prisoner in the offense.

The Supreme Court has determined that a criminal defendant has the right to a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The right is derived from the Sixth Amendment rights to compel and confront witnesses and from the Due Process Clause of the Fourteenth Amendment. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process law.").

The Supreme Court, however,  repeatedly has recognized that the right to present a defense is subject to reasonable restrictions. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (the Sixth Amendment does not confer on the accused an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible

under standard rules of evidence"); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers*, 410 U.S.

at 295; *see also Wong v. Money*, 142 F.3d 313, 325 (6th Cir. 1998).

> [S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Scheffer*, 523 U.S. at 308 (internal citations omitted).

    A.    <u>Intervening Cause</u>

    The Michigan Court of Appeals carefully considered Petitioner's claim that he was

entitled to the appointment of an expert to demonstrate that improper medical treatment constituted

an intervening cause of death:

> Herndon's argument has some merit. As a practical matter, a defendant may be entitled to have an expert available to help prepare for a trial, even if the expert does not provide a complete defense to criminal liability, but, for instance, helps the defense by impeaching the prosecution's experts. The critical question is whether the defense "cannot safely proceed to a trial" without the expert's assistance. Similarly, case law suggests that whether there was an intervening cause of death can be a jury question, which requires the trial court to allow the defense to call witnesses to help establish a factual basis for the defense even if the jury would have ultimately rejected it. Nevertheless, even if the trial court erred in denying the motion to appoint the expert and in barring the nurses from testifying, these errors were harmless. Neither ruling completely prohibited Herndon from mounting a defense. He was able to present witnesses who testified why others might have committed the crime.

> More importantly, "[i]n the medical treatment setting, evidence of grossly negligent treatment constitutes evidence of a sole, intervening cause of death." Anything less than that constitutes, at most, merely a contributory cause of death, in addition to the defendant's conduct. In this case, the evidence demonstrated that Sperle was dead *before* the resuscitation efforts began, meaning that the resuscitation efforts could not have been the "sole, intervening" reason for Sperle's death. Herdon, however, contends that the fact that those who responded to the scene of the crime attempted to resuscitate her at all suggests that she really was alive at that time.

We think it possible that the individuals who responded to help Sperle had that aim solely in mind at the time, irrespective of the probability that their efforts could made any difference.  In other words, their decision to take steps to revive Sperle did not, in and of itself, indicate whether she was alive.

In any event, this argument is unavailing because the intervening cause doctrine concerning grossly negligent medical care applies to nonfatal wounds that the defendant could not anticipate would cause death.   If thoroughly and extraordinarily incompetent medical care killed the victim, it would break the chain of causation, absolving the defendant of criminal liability.  As the Michigan Supreme Court explained long ago in *People v. Cook* [, 39 Mich. 236, 240 (1878)]:

> In a case where the wound is not mortal, the injured person may recover and thus no homicide have been committed.  If, however, death do [sic] result, the accused will be held responsible, unless it was occasioned, not by the wound, but by grossly erroneous medical treatment.  But where the wound is a mortal one, there is no chance for the injured person to recover, and therefore the reason which permits the showing of a death from medical treatment does not exist.

Modern courts have made the similar observation concerning the difference between fatal and nonfatal injuries when applying or rejecting the intervening cause doctrine.  Although the intervening cause doctrine may not absolve the defendant of criminal responsibility where there is a causal link between a nonfatal injury and the victim's death, it most definitely does not apply to an injury that is fatal.  There can be no doubt that the ligature, wrapped around Sperle's neck with so much force that it was embedded in her skin and initially invisible to trained medical personnel, caused a mortal wound.  Indeed, the brutality of this wound indicates that it was intended to kill.  Thus, even if the trial court should have granted the motion to appoint an expert and allowed the nurses to testify at trial, the error was harmless because the intervening cause doctrine could not apply in this case and, therefore, it is *not* "more probable than not" that these errors affected the outcome in this case.

*Herndon*, 633 N.W.2d at 396-97 (footnotes omitted) (emphasis in original).

In sum, the court of appeals concluded that the Michigan intervening cause defense was inapplicable on the facts of this case and that, because it was inapplicable, any error in appointing an expert and admitting testimony necessarily was harmless.  To the extent the court of appeals' determination rests on Michigan law, it is not reviewable in this habeas action.  This Court

- 21 -

may entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984). It simply is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

Moreover, even if the claim rose to the level of a constitutional violation, the state court properly concluded that any error would be subject to harmless error analysis. In order for this court to find that the admission of this evidence was not harmless, we must find that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." *See Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir. 1999) (holding that *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), standard continues to apply on habeas review even after the amendments to the AEDPA). The habeas petitioner must establish that the error resulted in actual prejudice. *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000). The harmless error standard announced in *Brecht* applies even if a federal habeas court is the first to review for harmless error. *Gilliam v. Mitchell*, 179 F.3d 990, 995 (6th Cir. 1999).

Here, because state law limits the availability of the defense to cases in which a defendant inflicts a wound that he could not anticipate would cause death, *People v. Webb*, 415 N.W.2d 9 (Mich. Ct. App. 1987), the state court's determination that any error was harmless was quite reasonable. Given the nature of the wounds, the defense was not available to Petitioner. As

- 22 -

a result, the lack of expert evidence on the negligence of any treating personnel was irrelevant. Petitioner's fifth claim therefore should be denied.

      B.    <u>Hearsay Statements</u>

      Petitioner next asserts that he was denied his right to present a defense by certain rulings prohibiting the defense from introducing hearsay statements into evidence. Petitioner complains that the court improperly excluded a letter from inmate Burt Lancaster to Inspector Ray, informing him that shortly before Sperle's death, he overheard inmate Foster, who worked in the store, state that he ought to kill the store lady because she was "messing around" with his checks. (Tr. VI, 52-53, 62-64.)  In addition, Petitioner complains that the trial court improperly precluded defense counsel from questioning Inspector Prough about whether he had heard from others that inmate Foster also had an injury to his hand around the time of the murder.  Instead, counsel was limited to inquiring about how Prough had conducted his investigation and eliminated other suspects. Further, the court ruled inadmissible Sergeant Berry's police report in which he stated that another inmate had accused inmate Foster of committing the murder.  Finally, Petitioner objects that the trial court sustained the prosecution's objection to defense counsel's questioning of Detective Farkas about the investigation of other inmate suspects.  Petitioner asserts that the rulings collectively deprived him of his defense that another inmate killed Sperle.

      The Michigan Court of Appeals concluded that Petitioner was not deprived of his right to present a defense by the challenged rulings:

> The problem with Herndon's argument is that each and every one of these rulings properly excluded hearsay because they repeated an out-of-court statement "offered in evidence to prove the truth of the matter asserted." We acknowledge that, in order to avoid denying the defendant a fair trial, even hearsay is admissible when "critical" to a defense.  In other words, Herndon's basic proposition – that a trial

- 23 -

court may not completely eviscerate a defendant's attempt to cast doubt on the prosecutor's proofs simply because the evidence proposed is hearsay – is correct. However, in this case, we see no likelihood that these rulings denied Herndon a fair trial because he was able to present to the jury his theory that another inmate killed Sperle. For example, though the trial court excluded inmate Lancaster's letter from evidence, it nevertheless allowed defense counsel to question him extensively during trial about why he believed inmate Foster should be suspected of killing Sperle. The trial court also allowed defense counsel to question Detective Farkas thoroughly about the investigation into the crime, including other suspects.

Herndon's argument that the trial court denied him the right to present a defense when it barred him from introducing into evidence Detective Farkas' whole interview with inmate Mass, who originally accused inmate Foster falsely, also reveals an important aspect of this disputed evidence as a whole. This evidence was not inherently trustworthy. Trustworthiness is a factor other courts have found significant when concluding that the defendant's right to present a defense allowed hearsay evidence to be introduced to the jury. Thus the trial court did not err in excluding this evidence.

*Herndon*, 633 N.W.2d at 402 (citing *Chambers*, 410 U.S. at 302) (footnotes omitted).

As previously discussed, the Constitution confers upon criminal defendants the right to present a complete defense, subject to reasonable restrictions on the admission of testimony. See *Scheffer*, 523 U.S. at 308; *Taylor*, 484 U.S. at 410; *Rock*, 483 U.S. at 55; *Chambers*, 410 U.S. at 295. A petitioner "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302. In applying its evidentiary rules, a state must weigh the interests served by the rule against the limitation imposed upon the defendant's constitutional right to present a defense. *See Rock*, 483 U.S. at 56.

In *Chambers*, the Supreme Court invalidated a state's hearsay rule on the ground that it abridged the defendant's right to "present witnesses in his own defense." 410 U.S. at 302. Chambers was tried for a murder to which another person repeatedly had confessed in the presence

- 24 -

of acquaintances.  The state trial judge barred the evidence because the state hearsay rule did not contain an exception for declarations against penal (as opposed to pecuniary) interest.  *Id.* at 299. Moreover, the state's "voucher" rule, which prohibited parties from impeaching their own witnesses, barred Chambers from calling the declarant to the stand and introducing his out-of-court statement against him.  *Id.* at 295-96.  The Supreme Court held that local rules of evidence cannot be applied "mechanistically" when such rules would threaten the "fairness and reliability [of] . . . the ascertainment of guilt and innocence" and thereby "defeat the ends of justice."  *Id.* at 302.

Since that time, in *Washington v. Texas*, 388 U.S. 14 (1967), the Supreme Court rejected another categorical exclusion, that is, Texas' blanket exclusion of the testimony of other persons charged as principals, accomplices or accessories in the same crime.  388 U.S. at 15.  *See also Crane v. Kentucky*, 476 U.S. 683 (1986) (holding that the exclusion of testimony regarding the circumstances of the petitioner's confession for purposes of assessing the reliability and credibility of the confession deprived him of his right to present a defense); *Rock*, 483 U.S. at 61 (striking down Arkansas' per se rule excluding all hypnotically refreshed testimony because it placed an arbitrary restriction on a criminal defendant's constitutional right to testify on her own behalf).

Although *Chambers* and its progeny unquestionably remain the law, recent decisions of the Supreme Court have made clear that *Chambers* may be invoked only in extreme cases.  For example, in *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996), a plurality of the Court sought to limit *Chambers* to its facts, stating:

> Thus, the holding in *Chambers* – if one can be discerned from such a fact-intensive case – is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Egelhoff*, 518 U.S. at 52.  Similarly, discussing *Crane*, the *Egelhoff* Court stated that its decision "[did] nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a 'valid' reason." *Egelhoff*, 518 U.S. at 53.

Most recently, a majority of the Supreme Court held that a per se rule against admission of polygraph evidence in court martial proceedings did not violate the Fifth or Sixth Amendment rights of accused to present a defense. *See Scheffer*, 523 U.S. 303 (1998).  The Court held that state rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)). The Court added that the exclusion of evidence is unconstitutionally arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused." *Id.*  As the *en banc* Sixth Circuit recently observed, "the Supreme Court has made it perfectly clear that the right to present a 'complete' defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions." *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc), *cert. denied* 124 S. Ct. 1601 (2004).

Furthermore, Chambers was decided before the enactment of the AEDPA, and, thus, the Court did not apply the highly deferential AEDPA standard.  Under the AEDPA, a federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.  As the Sixth Circuit recently stated in reviewing a state

court's determination to exclude hearsay evidence, "[w]hether this court would or would not have come to the same conclusion reached by the Michigan Court of Appeals as to the trustworthiness of the preferred statements is completely irrelevant." *Allen v. Hawley*, No. 01-1320, 2003 WL 21911327, at *6 (6th Cir. Aug. 7, 2003). The question is whether the Michigan Court of Appeals unreasonably applied *Chambers* and its progeny. *Id.*

The Michigan Court of Appeals' application of *Chambers* unquestionably was reasonable. *Chambers* and its progeny all involved the wholesale exclusion of an entire category of evidence or witnesses, prohibitions the Supreme Court found to be disproportionate to the harm the rules were designed to prevent. Here, in contrast, the state court's exclusion of hearsay evidence was neither arbitrary nor disproportionate. The excluded evidence unquestionably was rejected for a rational purpose and after a particularized determination, because it was unreliable hearsay. Moreover, as the Michigan Court of Appeals noted, Petitioner undisputedly was permitted to introduce a variety of evidence going to his theory that the murder was committed by another inmate, and he was permitted to question witnesses in such a way as to introduce substantially the same information by non-hearsay means. As a result, the Michigan Court of Appeals reasonably concluded that Petitioner's right to a fair trial and to present a defense was not unconstitutionally impaired by the exclusion of the evidence in issue. In sum, I recommend that Petitioner's fifth and sixth grounds for habeas relief be denied as meritless.

## V. Evidentiary Errors: Grounds 7, 8, 10, 12 and 13

In grounds seven, eight, ten, twelve and thirteen of his habeas application, Petitioner challenges the admission of various matters into evidence at trial. In ground seven, he complains of the admission of DNA evidence. In ground eight, he asserts that trial court erred in admitting a

statement he made at his preliminary hearing, which arguably suggested an admission of guilt. Ground ten asserts that the trial court improperly permitted corrections officer Scott Bentley to testify, despite the fact that Bentley had not been endorsed as a witness before trial. In ground twelve, Petitioner claims that the trial court improperly permitted the introduction of photographic evidence. Finally, in ground thirteen, Petitioner asserts that the trial court erred in denying his motion to exclude evidence that the victim had dismissed Petitioner from his prison job.

As I previously have noted, habeas corpus review lies only for a violation of the Constitution. 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, the Court may not grant relief if it would have decided the evidentiary question differently. The Court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860. (6th Cir. 2000).

Petitioner has not met this difficult standard. The Michigan Court of Appeals carefully examined each purported evidentiary error and found each of Petitioner's claims to be without merit. I have reviewed each of Petitioner's evidentiary claims and find the state court's

conclusions were patently reasonable.  In no event did any evidentiary admission result in a fundamental deprivation of due process.  Petitioner's seventh, eighth, tenth, twelfth and thirteenth grounds for habeas relief therefore should be denied.

### VI.        Fifth Amendment – Self-Incrimination:  Ground 9

Petitioner asserts that his Fifth Amendment right against compulsory self-incrimination was violated when he was interrogated by a corrections officer about the injuries to his hand without having been advised of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966).  He therefore alleges that the trial court improperly denied his motion to suppress.

On December 5, 1997, the trial court held an evidentiary hearing pursuant to *People v. Walker*, 132 N.W.2d 87 (Mich. 1965), on Petitioner's motion to suppress.  (12/5/97 Hrg. Tr., 64-144; docket # 24.)  At the hearing, three corrections officers testified: Resident Unit Officer Ronald Koch, Sergeant Gerald Berry, and Resident Unit Manager Dennis Hammond.  Koch testified that when the alarm went off at 1:50 p.m. on the day of the murder, he received a walkie-talkie announcement of a "code blue" in the school.  (12/5/97 Hrg. Tr., 70, 82.)  Koch was not aware of the nature of the disturbance or if the code blue was a practice mobilization.  (12/5/97 Hrg. Tr., 82, 84.)  Koch testified that after he got all of the prisoners back and locked in their cells, he was directed by Hammond to check all inmates' hands for injuries.  (12/5/97 Hrg. Tr., 71.)  He and Officer Boardman checked all 42 prisoner cells.  During his check, he noticed a injury on Petitioner's hand and made a note to return to the cell later.  (12/5/97 Hrg. Tr., 71.)  Koch did not say anything to Petitioner at the time.  (12/5/97 Hrg. Tr., 72.)  Approximately five minutes later, he returned to the cell with Berry and Hammond.  Koch and Hammond went into the cell and asked Petitioner how he had injured his hand.  Petitioner reported that he had done it on the railing of the stairway.

(12/5/97 Hrg. Tr., 73.)  Hammond asked Petitioner again and Petitioner responded that he did not

know how he had hurt his hand.  (12/5/97 Hrg. Tr., 74.)  After Petitioner had given his answers, he

was handcuffed and taken to the segregation unit.  (12/5/97 Hrg. Tr., 74.)

Berry testified that when he, Koch and Herndon went to Petitioner's cell, he observed

that Petitioner had a bruise and some skin removed on his hand.  (12/5/97 Hrg. Tr., 106.)  Koch and

Hammond asked Petitioner the questions about how he injured his hands.  (12/5/97 Hrg. Tr., 109-

110.)  Berry testified that Petitioner was asked several times and gave several answers.  (12/5/97

Hrg. Tr., 106.)   According to Berry, the officers did not enter the cell, but had Petitioner put his

hands through the food slot.  (12/5/97 Hrg. Tr., 109.)  On cross-examination, Koch, Berry and

Hammond all acknowledged that Petitioner had been compliant and had responded to the questions.

(12/5/97 Hrg. Tr., 96, 110-11, 135.)  Berry further acknowledged that Petitioner could have been

charged with disobeying a direct order if he refused to comply with the officers' orders.  (12/5/97

Hrg. Tr., 114-15, 118-20, 122.)

Hammond testified that he went to Petitioner's cell and saw that Petitioner had

abrasions on about three knuckles and a big chunk of skin missing from one.  (12/5/97 Hrg. Tr.,

128.)  When he first asked Petitioner how he had done it, Petitioner replied that he had done it on

the door slot.  Officer Koch responded that he thought Petitioner had said he did it on the stairway.

As a result, Hammond asked again and Petitioner stated that he could not remember how he had

done it.  (12/5/97 Hrg. Tr., 128-29.)   At that point, Petitioner was handcuffed and taken to the

segregation unit.  (12/5/97 Hrg. Tr., 129.) Hammond testified that although Petitioner theoretically

could have been issued a misconduct ticket if he refused to answer a question, a misconduct ticket

was rarely issued in such circumstances and he probably would not have issued one.  (12/5/97 Hrg.

Tr., 131-32.)  As the person in authority, Hammond also probably would have intervened had one

of the other officers decided to issue a misconduct ticket for such a refusal.  (12/5/97 Hrg. Tr., 132-

33.)

        On December 19, 1997, after the parties had submitted supplemental authorities, the

trial court ruled that Petitioner's statements were not the product of coercion.  (12/19/97 Hrg. Tr.,

9.)  The court noted that, at the time of the questioning, the officers did not even know what they

were investigating.  They were asking all prisoners the same questions.  Petitioner was not the focus

of the investigation.  (12/19/97 Hrg. Tr., 10.)  The court therefore found that Petitioner was not being

interrogated so as to require warnings and that his exculpatory statements were voluntary.  (12/19/97

Hrg. Tr., 10.)

        The Michigan Court of Appeals deferred to the trial court's factual findings, but

reviewed *de novo* the question of whether Petitioner was "in custody" at the time he made his

statements within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966):

> *Miranda* warnings are necessary only when the accused is interrogated while
> in custody, not simply when he is the focus of an investigation.   Custodial
> interrogation is "'questioning initiated by law enforcement officers after a person has
> been taken into custody or otherwise deprived of his freedom of action in any
> significant way.'" [*People v. Hill*, 415 N.W.2d 193, 195-98 (Mich. 1987) (quoting
> *Miranda*, 384 U.S. at 444).]  Furthermore, "[i]n addition to the elements of 'custody'
> and 'interrogation,' there must be some nexus between these elements in order for
> *Miranda* to apply." [*People v Honeyman*, 546 N.W.2d 719, 723 (Mich. Ct. App.
> 1996).]  That a defendant is in prison for an unrelated offense when being questioned
> does not, without more, mean that he was in custody for the purpose of determining
> whether *Miranda* warnings were required.
>
> Herndon was in prison for an unrelated offense at the time RUO Koch and
> RUO Hammond questioned him.  Thus, he was in "custody" at the time he was
> questioned.   However, there was not nexus between his "custody" and his
> "interrogation"; that is, Herndon "was not taken into, or maintained in, custody to
> *facilitate* his interrogation." [*Honeyman*, 546 N.W.2d at 723.]  Questioning Herndon

about the injuries to his hands in his regular prison cell was not the "'inherently compelling'" atmosphere against which *Miranda* protects.

Contrary to Herndon's related argument that the statement he made was the product of coercion, the trial court did not clearly err in finding that the statement was freely made. Herndon has never demonstrated that he would have been subject to any particular penalty, such as being issued a misconduct citation, for refusing to answer the questions posed to him regarding the injury to his hands. Nor did the officers indicate in their testimony that they threatened him with a misconduct citation if he refused to answer their questions. To the contrary, RUM Hammond testified that he has never issue a misconduct citation to a prisoner for refusing to answer a question and that if Herndon had refused to answer the questions he probably would not have issued one. Furthermore, the officers did not put Herndon in handcuffs until *after* they asked him about his hands, which indicates that they were not coercing him at the time he made the statements. Therefore, not only were *Miranda* warnings unnecessary at the time Herndon made the statements because he was not in custody connected to the interrogation, the officers did not actually coerce him to make these statements. Accordingly, the trial court did not err in denying the motion to suppress the statements.

*Herndon*, 633 N.W.2d at 395.

The state court's determination constituted a reasonable application of the standards established by United States Supreme Court precedent. The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST., AMEND. V. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that, in order to enforce the Fifth Amendment, law enforcement officers must provide certain warnings to suspects before beginning any "custodial interrogation." *Miranda*, 384 U.S. at 444. A custodial interrogation occurs whenever law enforcement officers question a person after the person has been taken into custody or otherwise significantly deprived of his freedom of action. *Id.* However, not all "on-the-scene questioning" concerning the facts or circumstances surrounding a crime or other general questioning of citizens during a fact-finding process triggers the requirement of *Miranda* warnings. *Id.* at 477-78.

- 32 -

In *Mathis v. United States*, 391 U.S. 1 (1968), the Supreme Court considered whether prison inmates were entitled to *Miranda* warnings prior to interrogation.  At the time of the interrogation in *Mathis*, the petitioner was in prison, serving a sentence on a state conviction.  *Id.* at 2.  A federal agent came to the prison to investigate tax fraud charges against Mathis.  During the interrogation, which was conducted without *Miranda* warnings, the officer obtained statements and documents that were used at trial.  Petitioner sought to have the judge hold hearings out of the presence of the jury to prove that the statements to the revenue agent were given without warnings and therefore could not be used as evidence.  *Id.* at 3.  The Court rejected the government's position that *Miranda* warnings were never required before interrogation of a prisoner then-incarcerated for an unrelated crime.  *Id.* at 4-5.  The Court held that, under the circumstances of that case, Mathis was entitled to and wrongly deprived of *Miranda* warnings.  *Id.* at 5.

Since *Mathis*, however, the Court has rejected the principle that *Miranda* warnings are required before any interrogation of an incarcerated person.  While not overruling the case, the Court has seriously undermined the holding in *Mathis*.  In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Court held that police agents could procure admissible statements from defendants in jails or prisons through the use of "stool pigeons" or undercover agents.  *Id.*  In reaching its determination, the Court observed that "[t]he bare fact of custody may not in every instance require a warning even when the suspect is aware that he his speaking to an official, but we do not have the occasion to explore the issue here."  *Id.* at 299.

Various circuit courts have considered the necessity of *Miranda* warnings in a prison context.  In *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978), the Ninth Circuit held that an inmate is not automatically considered "in custody" and thereby entitled to *Miranda* warnings prior to any

prison interrogation. *Id.* at 427. The *Cervantes* court held that to apply *Miranda* to all prison questioning would "torture [*Miranda*] to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Id.* The court considered the key question for determining whether *Miranda* should apply to a prison situation was whether "a reasonable person would believe there had been a restriction of his freedom over and above that in his normal prisoner setting." *Id.* at 428. The court applied four factors in making the determination: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which the prison officials confront the individual with evidence of his guilt; and (4) whether officials exerted any additional pressure to detain the individual." *Id.* Applying those factors to the circumstances present in *Cervantes*, the court concluded that the interrogation was not custodial and therefore warnings were not required.

In *United States v. Conley*, 779 F.2d 970 (4th Cir. 1985), the Fourth Circuit followed the reasoning of the *Cervantes* court. The *Conley* court agreed that *Mathis* could not be construed broadly, so as to provide a right to warnings prior to any questioning by corrections officers. The court noted that the traditional *Miranda* analysis was not well-suited to the prison context. "Evaluation of prisoner interrogations in traditional freedom-to-depart terms would be tantamount to a *per se* finding of 'custody,' a result we refuse to read into the *Mathis* decision." *Conley*, 779 F.2d 973. The court therefore adopted the fundamental concept set forth in *Cervantes*, that custody in the prison setting "'necessarily implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement.'" *Conley*, 779 F.2d at 973 (quoting *Cervantes*, 589 F.2d at 428). The court held that, notwithstanding the fact that Conley had been taken to a separate conference area and wore handcuffs and/or full restraints, he was not subject to

an added restriction relevant to *Miranda* because he was taken to the area primarily for medical treatment and the restraints utilized were those applied whenever prisoners were transferred. *Id.* at 973-74.

The Eleventh Circuit also followed the *Cervantes* reasoning. *See Garcia v. Singletary*, 13 F.3d 1487 (11th Cir. 1994). The *Garcia* court reiterated *Miranda*'s rule that general, on-the-scene questioning as to fact surrounding a crime or other general questioning did not require warnings. The court noted that "'[o]n-the-scene questioning' may take place in a prison environment as well as in public." *Id.* at 1491 (citing *Cervantes*, 589 F.2d at 427). Applying the *Cervantes* factors, the court held the deputy's questioning of an inmate about his reasons for starting a fire, which occurred promptly after the deputy removed the prisoner from the cell and extinguished the fire, was not custodial and did not require *Miranda* warnings. *Id.*

Both the Seventh and the Eighth Circuits also have concluded that the mere fact of incarceration does not automatically render an interrogation custodial. *See United States v. Menzer*, 29 F.3d 1223, 1231 (7th Cir. 1994); *Levitson v. Black*, 843 F.2d 302, 304 (8th Cir. 1988). The courts look to the totality of the circumstances to determine whether the inmate was "in custody" as set forth in *Miranda*. *Menzer*, 29 F.3d at 1232 (relying on *Conley* and *Levitson*). The question ultimately is "whether a reasonable man in the the suspect's position would have understood himself to be in custody." *Levitson*, 843 F.2d at 304 (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

From the cited cases, it is abundantly clear that Supreme Court authority does not clearly establish that *Miranda* warnings are required under the circumstances of this case. Moreover, applying the factors identified by other circuit courts, this is not a situation in which a reasonable

prisoner would have considered he was in custody at the time of the questioning.  Petitioner was in his own cell, was not in any form of restraints and was subjected to only a brief and relatively routine series of questions about his injury.  Although the question was asked more than once, it was asked by two different people, neither of whom was aware of nature of the incident under investigation.  No threats were made and no coercive methods were used.  As the state courts found, the evidence indicated that the possibility of a misconduct citation for refusing to speak was, at best, remote.  As a result, little more than the simple fact of incarceration is alleged here to support a finding of custody, a circumstance rejected by the courts as sufficient.  I therefore conclude that the state court's findings were not clearly erroneous and its denial of Petitioner's ninth ground for habeas relief constituted a reasonable application of Supreme Court precedent.

Further, even were Petitioner's statements wrongly admitted, Petitioner would not be entitled to habeas relief.  The admission of this evidence must be considered harmless unless the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict."  *See Nevers*, 169 F.3d at 371 (citing *Brecht*, 507 U.S. at 623).  Here, Petitioner's statements suggested only a modest discrepancy in the cause of his injury.  In light of the other evidence in the case, Petitioner's statements cannot be said to have had a substantial or injurious effect on the jury's verdict.  For both reasons, Petitioner is not entitled to relief on his ninth ground for habeas relief.

### VII.   Illegally Seized Evidence:  Ground 11

Petitioner contends that his Fourth Amendment rights were violated when his cell was searched without a warrant.  He therefore asserts that the evidence seized in the cell search was improperly admitted at trial.

First, as the Michigan Court of Appeals held, Petitioner has no expectation of privacy in his prison cell. *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984). The Fourth Amendment therefore does not protect him against searches of his cell. *Id.*

In addition, even if Petitioner had a Fourth Amendment interest in his prison cell, his claim would not be reviewable in this proceeding under the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *See also Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000); *McQueen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996). In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the present case must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986). Because Petitioner was both permitted to present and did present his Fourth Amendment claim in the state courts, his claim is unreviewable in a federal habeas corpus proceeding. For both reasons, Petitioner's eleventh ground should be denied.

## VIII.   Denial of Jury View:  Ground 14

In his fourteenth ground for relief, Petitioner contends that the trial court erred in denying his motion to allow a jury view of the crime scene. The majority of Petitioner's argument

rests on MICH. COMP. LAWS § 768.28, which provides that it is within the discretion of the trial judge whether to permit a jury view of the crime scene.

Petitioner's claim under state law is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (making habeas relief available for persons in custody in violation of the Constitution or other United States law); *Blackledge*, 431 U.S. at 75 n.7. The federal courts have no power to intervene on the basis of a perceived error of state law. *Pulley*, 465 U.S. at 41; *Estelle*, 502 U.S. at 68.

In the last two paragraphs of his argument on this issue, Petitioner asserts that the trial court's decision to not allow a jury view violated his Sixth and Fourteenth Amendment rights to present a defense. As I previously have noted, a criminal defendant has the right to a "meaningful opportunity to present a complete defense." *Trombetta*, 467 U.S. at 485. However, the right to present a defense is subject to reasonable restrictions. *See Scheffer*, 523 U.S. at 308; *Taylor*, 484 U.S. at 410; *Rock*, 483 U.S. at 55; *Chambers*, 410 U.S. at 295; *see also Wong*, 142 F.3d at 325. The exclusion of evidence abridges the right to present a defense only where it is "unconstitutionally arbitrary or disproportionate," that is, "only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

The trial court's denial of Petitioner's request for a jury view unquestionably was neither arbitrary nor disproportionate to the interests it sought to protect. The court of appeals held:

> MCL 768.28 and MCR 6.414(D) both permit a trial court, in its discretion, to allow the jury to visit a place where an event connected with the crime occurred. The court rule specifies that only a court officer may communicate with the jury "concerning a subject connected with the trial." [MCR 6.414(D)] However, both the prosecutor and the trial court expressed legitimate doubts about whether the prison officials would be able to control the inmates and prevent them from shouting remarks about the case to the jury, which may have merited denying the motion in and of itself.

- 38 -

> When the risk of communication with the jury was added to the inherent danger of the locale and the adequate evidence of the layout of the HVMF facility already in evidence, we cannot find any error in the trial court's reasons for denying the motion, much less an abuse of the trial court's discretion.

*Herndon*, 633 N.W.2d at 405-06.  Unquestionably the court's concerns jury interference and danger were significant ones.  Petitioner's interest in showing the jury the layout of the facility and explaining the difficulty in traveling from the store to the laundry area was adequately protected by the introduction of numerous photographs and diagrams.  The court of appeals's determination that the trial court properly denied Petitioner's request for a jury view did not constitute an unreasonable application of established Supreme Court precedent.

## IX.    Sufficiency of the Evidence: Ground 15

In his fifteenth ground for relief, Petitioner asserts that he was denied due process because the prosecutor introduced insufficient evidence that Sperle was murdered while lawfully engaged in the performance of her duties as a corrections officer, as required under MICH. COMP. LAWS § 750.316(C).  A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-402 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

In the Michigan Court of Appeals, Petitioner challenged the sufficiency of the evidence on both the first-degree premeditated murder charge, MICH. COMP. LAWS § 750.316(1)(a), and the first-degree murder of a law corrections officer, MICH. COMP. LAWS § 750.316(1)(c). In the instant petition, he challenges only the sufficiency on the second charge. The Michigan Court of Appeals applied the correct standard, giving short shrift to Petitioner's second argument:

> To determine whether Herndon's claim that there was insufficient evidence to convict him has merit, "this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt."
>
> . . .
>
> Herndon claims that the evidence that Sperle was performing her official duties at the time she was murdered was insufficient to support a conviction under M.C.L. § 750.316(1)(c). We disagree. Sperle was killed in her workplace during work hours. When the evidence is viewed in the light most favorable to the prosecution, the jury could reasonably infer that she had no reason to be in that area of the prison other than to be doing her work.

*Herndon*, 633 N.W.2d at 404 (footnotes omitted). The court of appeals' decision is unquestionably reasonable. Not only was the referenced jury inference permissible, it undoubtedly is the only reasonable inference arising from the facts. Sperle was working at the time she was murdered. She was killed in the prison store where she worked. She had held a meeting in the store about store purchasing shortly before the murder. It is difficult to conclude what alternative inference would be reasonable. While Petitioner suggests that Sperle may have been on lunch break or engaged in an illicit affair, his suggestion is wholly speculative and is premised upon Petitioner's theory that another person committed the offense, a conclusion rejected by the jury. Applying the standard of review established under the AEDPA, the determination by the Michigan Court of Appeals clearly constituted a reasonable application of Supreme Court precedent.

## X.        Erroneous Jury Instruction: Ground 16

In his final ground for habeas relief, Petitioner contends that he was denied due process by an erroneous jury instruction.  Specifically, he argues that the trial court improperly granted a prosecution motion to issue a special jury instruction concerning Petitioner's inconsistent statements to corrections officers about how he injured his hand.  The court gave the following instruction:

> There has been some evidence that the defendant has made a false statement to corrections officers when questioned about the injuries to his hands.
>
> This evidence does not prove guilt.  A person may make a false statement for innocent reasons, such as panic, mistake or fear.  However, a person may also make a false statement because of consciousness of guilt.
>
> You must decide if the defendant made the statements and if so whether or not they were false.  However, if you find defendant made a false statement, you may consider the defendant's false statements to the corrections officers as evidence of guilt.

(Tr. IX, 195.)

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle*, 502 U.S. at 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

The Michigan Court of Appeals squarely rejected Petitioner's claim that the instruction improperly emphasized the prosecutor's theory of the case, notwithstanding the fact that the statements were never proved to be false and did not relate to an element of the offense:

> Quite plainly, the instructions strike a roughly even balance between favoring the defense and the prosecution. The trial court unequivocally informed the jury that the inconsistent statements alone did not prove Herndon's guilt and that there were several "innocent reasons" why a defendant might make such statements. The trial court also charged the jury to think about the evidence independently when determining whether the statements were in fact false; the trial court did not require the jury to accept that the statements were actually false. Thus, this instruction did not unduly favor the prosecution.

> Herndon has not provided us with any authority supporting his argument that, for the jury to consider these inconsistent statements when pondering his guilt or innocence, the statements had to be directly related to an element of the offense in order "to be truly exculpatory." This proposition flies in the face of the jury's legitimate ability to consider circumstantial evidence when rendering a verdict. Moreover, it is not error requiring reversal to instruct a jury that it could consider a false statement as evidence of guilt when there is other evidence also supporting the guilty verdict, as in this case.

*Herndon*, 633 N.W.2d at 407 (footnotes omitted).

The court of appeals' determination that the instruction was impartial clearly was reasonable. Moreover, Petitioner has failed entirely to demonstrate that the instruction, even if improper, could have "so infected the entire trial that the resulting conviction violates due process." *Henderson*, 431 U.S. at 155; *Estelle*, 502 U.S. at 75. As a result, Petitioner's sixteenth ground for habeas review is without merit.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.

Dated:  May 23, 2005           /s/ Hugh W. Brenneman, Jr.
                                   Hugh W. Brenneman, Jr.
                                   United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).